UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CRIMINAL NO. 3:19-CR-0146-B |
| | § | |
| LEAH HAGEN (1), and MICHAEL | § | |
| HAGEN (2), | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants Leah and Michael Hagens' Joint Rule 33 Motion for New Trial (Doc. 289). For the reasons that follow, the motion is **DENIED**.

## I.

## BACKGROUND[1]

The Hagens, husband and wife, were each charged by superseding indictment with one count of conspiracy to defraud the United States and to pay and receive health care kickbacks, and one count of conspiracy to commit money laundering. Doc. 50, Superseding Indictment, 5–11. They were tried together before a jury beginning on June 28, 2021, and were each convicted on both counts. Doc. 282, Verdict, 1.

According to the Superseding Indictment, the Hagens owned durable medical equipment (DME) companies and enrolled these companies in Medicare to provide DME to Medicare

---

[1] In this section, the Court provides only a general overview of the substantive and procedural facts. The Court recounts more detailed facts in analyzing the merits of the motion in Part III, *infra.*

beneficiaries. Doc. 50, Superseding Indictment, 2, 7. Medicare reimburses providers who render services to beneficiaries. *Id.* at 3. The Superseding Indictment charged the Hagens with paying, through one of their DME companies—Metro DME Supply—"illegal kickbacks and bribes in the amount of approximately $6.6 million to Herb Kimble," a co-conspirator, "in exchange for completed, signed prescriptions for DME and other Medicare-required documents (collectively referred to as 'doctors' orders')." *Id.* at 7. The Superseding Indictment further charges the Hagens with paying, though their other DME company—Ortho Pain Solutions—"illegal kickbacks and bribes in the amount of approximately $8.2 million to Herb Kimble . . . in exchange for doctors' orders." *Id.* at 8. Such conduct, according to the Superseding Indictment, violates the Anti-Kickback Statute.

The Government alleged that "[t]o facilitate and conceal the payment of kickbacks and bribes from Medicare and state regulators, [the Hagens and Kimble] through [Kimble's companies, Pantheon and Chronos], created sham contracts, invoices and other documentation that disguised the payments as for marketing and business process outsourcing, among other services." *Id.* The Government's theory at trial was that the Hagens' lump sum payments to Kimble's companies for completed doctors' orders were "reverse-engineered" on these sham invoices to conceal the fact that the Hagens were paying for doctors' orders. Doc. 291, Gov't's Resp., 6.

The Hagens' theory at trial, on the other hand, "was that they lacked criminal intent because Mr. Kimble assured them that they were paying for legitimate marketing and business processing services, and that the companies providing these services operated in a lawful and compliant way." Doc. 289, Defs.' Mot., 3.

-2-

Following an eight-day trial, the Hagens were convicted on all counts. *See* Doc. 282, Jury Verdict. The Hagens now seek a new trial, raising a litany of purported errors. *See generally* Doc. 289, Defs.' Mot. The motion is ripe for review. Finding none of the Hagens' arguments for new trial availing, the Court **DENIES** their motion.

## II.

## LEGAL STANDARD

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Whereas a Rule 29 motion turns on the sufficiency of the evidence, a motion under Rule 33 turns on whether the weight of the evidence supports the verdict. *See Tibbs v. Florida*, 457 U.S. 31, 42 (1982). Courts are granted broad discretion in making determinations based on the weight of the evidence. *United States v. Robertson*, 110 F.3d 1113, 1118 (5th Cir. 1997). Thus, in assessing a motion under Rule 33, a court may weigh the evidence and assess the credibility of witnesses. *United States v. Tarango*, 396 F.3d 666, 672 (5th Cir. 2005). However, a verdict cannot be set aside simply because another result would be more reasonable. *Robertson*, 110 F.3d at 1118. Rather, "[t]he evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *Id.* (citations omitted). Moreover, the Court "does not have the authority to grant a motion for new trial under Rule 33 on a basis not raised by the defendant," *United States v. Shoemaker*, 746 F.3d 614, 631–32 (5th Cir. 2014), or raised insufficiently by only "passing reference[.]" *United States v. Nguyen*, 507 F.3d 836, 839 (5th Cir. 2007) (per curiam).

III.

ANALYSIS

The Hagens raise the following grounds for new trial: (1) "Exculpatory *Brady* material essential to establishing the Hagens' innocence was withheld from the jury[,]" Doc. 289, Defs.' Mot., 3; (2) "The Hagens were prevented from fully presenting their own testimony and offering the testimony of their witnesses[,]" *id.* at 6; (3) "The Hagens' ability to cross-examine the key Government witness and alleged co-conspirator was improperly restricted[,]" *id.* at 8; (4) "The Hagens were not provided with an essential witness interview report of an alleged co-conspirator prior to their cross-examination of that witness[,]" *id.* at 9; (5) "Unfairly prejudicial evidence not related to any of the charges in the indictment was improperly admitted[,]" *id.* at 15; (6) "The Hagens were prejudiced by the admission of improper Rule 404(b) evidence[,]" *id.* at 17; (7) "Improper comments on the evidence were communicated to the jury during trial and during the reading of the jury charge[,]" *id.* at 19; (8) "A new trial is warranted due to other improprieties[,]" *id.* at 21; (9) "Jury instructions were admitted over the Hagens' objections, and other instructions requested by the Hagens were improperly denied[,]" *id.* at 22; and (10) The verdict is against the weight of the evidence. *Id.* at 23.

The Court analyzes these purported errors in turn.

A.      *The Court Did Not Exclude* Brady *Evidence.*

As noted above, the Hagens' theory at trial was that they lacked the requisite criminal intent because they thought Kimble was "operat[ing his businesses] in a lawful and compliant way." *Id.* at 3. "Central to this defense," according to the Hagens, was that Kimble took steps to "portray [a] veneer of compliance and legitimacy" by engaging the counsel of various reputable law firms. *Id.* The

Hagens thus sought to admit "documents and evidence pertaining to Mr. Kimble's consultations with his attorneys" and the "testimony of Joshua Skora, one of the . . . attorneys who provided Mr. Kimble's companies with compliance advice related to healthcare law." *Id.* at 3–4. The Court excluded these categories of evidence on relevance and hearsay grounds. Tr. Vol. 7, 28–32.

The Hagens state that Skora's testimony would have corroborated that the Hagens actually believed "Kimble was taking steps to ensure compliance with" the law and would have revealed "that the switch in the services performed by Chronos and Pantheon did not appear nefarious, as it was even made known to Mr. Kimble's counsel." Doc. 289, Defs.' Mot., 4.[2] The Hagens also point to more than 650 pages of documents as being "highly exculpatory and key to their defense" because they show that Kimble consulted with reputable law firms. *Id.* at 4 n.1 (referring the Court to "the Appendix to the Hagens' July 2, 2021 Trial Brief").

The Court did not err in ruling that all this evidence is inadmissible and will not disturb this ruling. The Hagens wanted to examine Skora to establish that Kimble was "consistently telling the same story that the Hagens were told, and he's not only doing it to other folks, he's doing it to law firms, too." Tr. Vol. 7, 28. This, according to the Hagens, would have bolstered their position that Kimble misled them by concealing the illegal nature of his operation. Doc. 289, Defs.' Mot., 4. But this testimony does not make the point the Hagens suggest it does.

---

[2] The evidence at trial established that, at one point during the Hagens' relationship with Kimble, the purported back-office processing services, initially billed to Pantheon began being billed to Chronos, and that the purported marketing services, initially billed to Chronos began being billed to Pantheon. Tr. Vol. 3, 285–90. Regardless of the effect this evidence had on the jury's verdict—about which the Hagens can only speculate—the Hagens have pointed to no particular piece of evidence or proposed testimony that established "the switch in the services" was "made known to Mr. Kimble's counsel." Doc. 289, Defs.' Mot., 4.

The Court permitted the Hagens to examine Skora outside the presence of the jury to form a record of what Skora's testimony would be. In his proposed testimony Skora confirmed that Pantheon and Chronos were his clients. *Id.* at 14–15. Skora described that the scope of his engagement was federal and state regulatory compliance advice. *Id.* at 21–22.  And Skora testified that Kimble did not tell Skora that he was selling doctors' orders. *Id.* at 24. This is hardly the key exculpatory information that the Hagens allege.  Moreover, the Hagens elicited this testimony from Kimble himself. The Hagens cross-examined Kimble on the fact that attorneys reviewed the contracts for compliance purposes, Tr. Vol. 4, 149–57; the Government never disputed this. And Kimble explained that he had attorneys review the contracts so that they would appear legitimate to auditors. *Id.* Skora's testimony that he advised Pantheon and Chronos on regulatory matters and that he was unaware that Kimble was selling doctors' orders would therefore have had little or no effect. *See United States v. Flitcraft*, 803 F.2d 184, 186 (5th Cir. 1986) (affirming exclusion of "case law and documents" the defendant claimed caused him to believe he was not breaking the law "because [the defendant] testified to the documents he relied on and their contents," thus "the documents themselves would have had little further probative value").

This conclusion is bolstered by the fact that Kimble engaged Skora *after* the Hagens signed their relevant agreements with Kimble. Tr. Vol. 7, 35 (noting Skora was engaged in October 2017); *id.* at 29 (noting the Hagens signed contracts with Kimble on April 4, 2016 and September 20, 2017). Thus, Skora's testimony would have been irrelevant to the contracts at issue in this case and was properly excluded.

Finally, putting aside the fact that the Hagens have not identified any specific document in the group of 650 that would have impacted the jury's verdict and how, this pile of physical

evidence—comprising emails between Kimble and his attorneys—is inadmissible for the same reason as Skora's testimony.

B.      *The Court Did Not Improperly Restrict Any Trial Testimony.*

The Hagens testified in their own defense at trial. The Hagens now state their respective testimonies were improperly restricted. Doc. 289, Defs.' Mot., 6. They also claim the cross-examination of three Government witnesses was cut short. *Id.* at 7.

1.      The Court did not improperly restrict Leah Hagen's testimony.

The Hagens claim that "Leah Hagen was prevented from offering critical testimony on her background, how she became personally familiar with [DME], and how she was able to fund the initial marketing campaign with Mr. Kimble's companies." *Id.*

This is simply not true. Leah Hagen *did* testify how she became familiar with DME and how the Hagens got the money to fund their "initial marketing campaign[.]" *Id.* In particular, Leah Hagen testified that she was in a car accident in college, causing her temporary paralysis. Tr. Vol. 6, 77–78. She then confirmed that this was her "introduction to durable medical equipment[.]" *Id.* at 79. She described the various pieces of DME she personally used. *Id.* at 79–80. She further testified that she began to work for a doctor at his DME company, and her experience using DME helped her get that job. *Id.* at 81. Later, when asked where Leah Hagen obtained the money to do the "marketing campaign" she stated that her "father had passed away" and "left [her] $40,000." *Id.* at 178–79. While the Court did not permit Leah Hagen to give details about her car accident, *id.* at 76, or to explain how her father passed away, deeming these details irrelevant, the contention that Leah Hagen was not permitted to testify about her introduction to DME or the source of her money is incorrect.

Nor did the Court err in preventing Leah Hagen from testifying as to irrelevant content. "A criminal defendant's constitutional right to present a defense covers 'relevant testimony.'" *United States v. Rivas-Estrada*, 761 F. App'x 318, 328 (5th Cir. 2019) (per curiam) (quoting *Rock v. Arkansas*, 483 U.S. 44, 55 (1987)). The district court has discretion to exclude the testimony of a criminal defendant when that testimony "provokes . . . sympathy" but is not relevant. *See United States v. Willis*, 38 F.3d 170, 177 (5th Cir. 1994) (battered woman's syndrome); *Rivas-Estrada*, 761 F. App'x at 328–29 (cancer treatments).

Here, while the Court permitted Leah Hagen to testify that she was raised as a Jehovah's Witness, the Court did not permit her to elaborate on what that "mean[t.]" Tr. Vol. 6, 71. Further, Leah Hagen was not permitted to explain what happened when she was seven after her mother "met a new man, and . . . came into [Leah Hagen's] bedroom." *Id.* at 72. Leah Hagen began to cry when she brought this up.[3] These categories of testimony were irrelevant and would have served only to evoke the jury's sympathy. The Court properly excluded them.

2.     The Court did not improperly restrict Michael Hagen's testimony.

Next, the Hagens state that "Michael Hagen was prevented from testifying as to his version of the events that occurred during the visit to Mr. Kimble's companies in the Philippines." Doc. 289, Defs.' Mot., 7. The Court rejects this argument. The evidence at trial revealed that during the course of his relationship with the Hagens, Kimble moved his business operation from one location ("the first office") to another ("the second office"), both of which the Hagens visited. Tr. Vol. 7, 247.

---

[3] During the bench conference, the Court held that "what happened with her mother and this man" was outside the scope of the case. Tr. Vol. 6, 73.

During his testimony, Michael Hagen was asked "what [he] saw" at the first office. *Id.* at 245. After Michael Hagen began describing physical attributes of the first office, the Court cut him off, as this testimony was "a little bit repetitive" of Leah Hagen's testimony. *Id.* at 245–46.

Indeed, Leah Hagen briefly described the first office in her testimony the prior day. Tr. Vol. 6, 224. Moreover, Michael was permitted to compare the second office to the first office: "It was a lot bigger than the first one, even more modern. Super organized, better divided. More spacious. It looked very good." Tr. Vol. 7, 247.

The Hagens fail to explain how the physical description of the first office was material to their case. In any event, the Hagens were permitted to testify as to the physical attributes of both offices.

    <u>3.</u>    <u>No new trial is warranted on the basis of other limitations on witness testimony.</u>

Next, the Hagens repeat their argument regarding Skora's proposed testimony. Doc. 289, Defs.' Mot., 7. Because the Court has fully addressed Skora's testimony above, it will not repeat those holdings here. And finally, the Hagens also mention in passing that "[o]ther critical witness examination also was cut short (including but not limited to the cross-examinations of Stephen Quindoza, Special Agent Kelly Luquette, and Justin Cain), precluding the Hagens from establishing the prejudicial bias, lack of relevance for sponsoring exhibits, and improper use of witnesses as undisclosed experts in violation of Federal Rule of Evidence 702." *Id.* The Hagens do not elaborate on how the cross-examination of these witnesses was "cut short" or cite to specific examples in the trial transcript. *See id.* Such a "passing reference" to this alleged error is insufficient for the Court to grant any relief, much less grant the Hagens a new trial. *Nguyen*, 507 F.3d at 839.

C.    *The Court Did Not Improperly Restrict the Hagens' Cross-Examination of Kimble.*

According to the Hagens, Kimble was "the key Government witness[.]" Doc. 289, Mot., 8. The Hagens cross-examined Kimble across two days. After "about three hours and 15 minutes," and counsel's statement that he "ha[d] at least another hour" of cross-examination to complete, the Court briefly permitted cross-examination to continue before imposing a fifteen-minute time limit for counsel to conclude his cross-examination. Tr. Vol. 4, 220, 228–29. However, the Court proceeded to permit counsel to cross-examine Kimble another thirty-minutes until the Court released the jury on its lunch break. *Id.* at 238. Additionally, the Court permitted counsel "one more half an hour" for cross-examination after the lunch break. *Id.* However, after the lunch break, counsel concluded his cross-examination "15 minutes early." *Id.* at 261. And after the Court asked counsel if he was "sure" he was finished, counsel confirmed: "I'm sure." *Id.* at 260–61. The Hagens argue their ability to cross-examine Kimble was inhibited by the Court's time limitations. Doc. 289, Defs.' Mot., 8. The Court rejects this.

The Court has "wide latitude" to restrict cross-examination "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *United States v. Herman*, 997 F.3d 251, 272 (5th Cir. 2021) (citations omitted). Here, the Court's restrictions on the Hagens' cross-examination of Kimble were based on concerns about "repetitive [and] only marginally relevant" testimony and within that "wide latitude[.]" *Id.*; *see also* Tr. Vol. 4, 228. In any event, the Court will not grant the Hagens a new trial based on their purported inability to more fully cross-examine Kimble when Kimble was subject to re-call by the Hagens in their case-in-chief and counsel concluded the cross-examination before the Court-imposed time limit had lapsed.

D.     *The Hagens Were Provided the Raymond Shores Interview Report with Ample Time to Make Use of It.*

One of the Government's witnesses at trial was Raymond Shores. Shores is Kimble's brother, and he testified that he knows the Hagens through Kimble. Tr. Vol. 2, 254. Shores testified that he owned several DME companies that "purchased patients"—or doctors' orders—"from [his] brother." *Id.* at 262. And when asked if he knew how the Hagens got their doctors' orders, Shores testified that "they purchased them from [his] brother[,]" too. *Id.* at 268. Shores testified that he knew this because he talked to Kimble about it, and because the Hagens confirmed it when Shores met them in the Philippines. *Id.* at 273. Finally, he generally explained how Kimble's operation worked. *Id.* at 276–84. During redirect examination, the Government asked Shores about a meeting between him, the Government, and the FBI in early March 2020 in Miami. Tr. Vol. 3, 77–78. Notes from that meeting are memorialized in a five-page report ("the Shores Report"). *See* Doc. 290, Defs.' Sealed Ex. 1. When the Government asked Shores about this meeting at trial, the Hagens did not object to the substance of Shores's testimony. Tr. Vol. 3, 77–80. However, on re-cross, counsel for the Hagens revealed that she had "never seen" the report at issue. *Id.* at 82. Counsel was then immediately given a copy during a sidebar ("the sidebar"). *Id.* This occurred on June 30, 2021. *Id.* at 1.

The Hagens began their case-in-chief one week later, on July 6, 2021. Tr. Vol. 6, 66. That morning, the Government notified the Court that, while it had produced the Shores Report in May 2020, defense counsel was unable to locate it in their files. Tr. Vol. 6, 4–5. The Government further stated that, along with all its productions, it provided defense counsel with a "production log" detailing the items within each production. *Id.* at 6. Defense counsel acknowledged this but stated

that, at least with respect to the production purportedly containing the Shores Report, they did not compare documents to the corresponding production log. *Id.* at 10–11. Thus, they "didn't notice [the Shores Report] was on the log and not in the documents." *Id.*[4] Maintaining that they "should have had the report before his cross-examination," the Hagens declined to re-call Mr. Shores in their case-in-chief. *Id.* at 58.

The Court acknowledges that the Government maintains it turned over the Shores Report in May 2020, *see* Doc. 291, Gov't's Resp., 14–15, but for the purpose of this Order, the Court assumes without deciding that the Government *did not* turn over the Shores Report until the sidebar. Nonetheless, the Court concludes no error resulted from this.

When evidence is produced late, "the analysis . . . turns on whether the defendant was prejudiced by the tardy disclosure." *United States v. Morrison*, 833 F.3d 491, 508 (5th Cir. 2016). And "[i]f the defendant received the material in time to put it to effective use at trial, his conviction should not be reversed simply because it was not disclosed as early as it might have and, indeed, should have been." *United States v. McKinney*, 758 F.2d 1036, 1050 (5th Cir. 1985) (citations omitted). Moreover, in the Northern District of Texas, criminal defendants have a reciprocal duty to inspect, within twenty-one days of production, for, among other things, "missing material." NDTX Standard Protocol for Discovery Production in Federal Criminal Cases at 3, available at http://www.txnd.uscourts.gov/sites/default/files/documents/DiscoveryProtocol.pdf.

---

[4] The Hagens state that during trial, counsel searched for the Shores Report by its purported Bates label and found that its Bates label was associated with "*another* document"—a report of an interview of an individual not involved in this case. Doc. 289, Defs.' Mot., 10–11 (emphasis in the original).

Here, the Hagens received the Shores Report with enough time to make use of it. The Shores Report is five pages, the Hagens received it a full week before they presented their case-in-chief, and Shores was subject to recall. *United States v. Decker,* 543 F.2d 1102, 1105 (5th Cir.1976) (affirming disclosure of information to correct false testimony after witness testified but while still subject to recall); *United States v. Nixon,* 634 F.2d 306, 311–13 (5th Cir. 1981) (affirming disclosure of witness immunity agreement at time of witness's testimony). Moreover, as defense counsel implicitly conceded when describing the team's method of reviewing productions, defense counsel did not comply with the reciprocal inspection obligation. *See* Tr. Vol. 6, 10–11. Under these circumstances, the Court finds no error even if the Hagens did not have access to the Shores Report until the sidebar.

E.    *The Court Did Not Admit Unfairly Prejudicial or Irrelevant Evidence.*

According to the Hagens, "the Government introduced numerous pieces of evidence, testimony, and argument relating to" the medical need of the braces provided to the Medicare beneficiaries by the Hagens. Doc. 289, Defs.' Mot., 15. Without pointing to any specific pieces of such evidence or testimony, the Hagens argue that this evidence constitutes a variance from the Superseding Indictment. *Id.* at 16. Indeed, the Hagens state that they "had no notice that the medical necessity of braces or topics related to doctors' interactions with patients would be at issue at trial[.]" *Id.* Moreover, they claim "injecting" medical necessity into the case is prejudicial because the Hagens had no role in the doctors' prescribing decisions. *Id.* at 17. The Court rejects this argument.

The Supreme Court has "held on several occasions that an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs the defendant of the charge against

which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Bailey*, 444 U.S. 394, 414 (1980) (citations and quotation marks omitted). A material variance occurs "when the proof at trial depicts a scenario that differs materially from the scenario charged in the indictment but does not modify an essential element of the charged offense." *United States v. Meza*, 701 F.3d 411, 423 (5th Cir. 2012) (quoting *United States v. Mitchell*, 484 F.3d 762, 769 (5th Cir. 2007)).

A variance did not occur here, and the Hagens were on notice that medical necessity of the braces they provided might come up. The Superseding Indictment, contrary to the Hagens' assertion, provides notice that medical necessity would be an issue. It clearly alleges that in order for a DME claim to qualify for reimbursement from Medicare, it must be "medically necessary to the treatment of the beneficiary's illness or injury[.]" Doc. 50, Superseding Indictment, 3. Moreover, the Government argues that "[e]vidence of the false nature of the prescriptions, as well as testimony from Medicare beneficiaries whose prescriptions the defendants used to bill Medicare were acts 'done in furtherance of the alleged conspiracy' and were 'part of the very act charged.'" Doc. 291, Gov't's Resp., 17 (quoting *United States v. Barnes*, 803 F.3d 209, 220 (5th Cir. 2016)). The Court agrees. Indeed, the Court finds the evidence of the medical necessity of the prescriptions went to the Hagens' knowledge and intent. There is no error warranting new trial arising from this evidence.

F.    *The Court Did Not Improperly Admit Rule 404(b) Evidence.*

Pretrial, the Government filed a notice of intent to offer evidence under Rule 404(b). By this notice, the Government informed the Hagens of its intent "to call witness Adam Twersky," former manager of a call center called "Brightstar DME and Visionary," who would testify that the Hagens "paid kickbacks to the owner of Brightstar, John Krawczyk, in exchange for doctors' orders through

. . . Metro DME Supply[.]" Doc. 138, Gov't's Notice, 1. The Government also notified the Hagens that it anticipated Kimble would testify that he introduced the Hagens to Twersky. *Id.* at 2. The Court initially ruled pretrial that Twersky's testimony would be "more prejudicial than probative" because it was too similar to the charged conduct. Doc. 223, Order, 2. However, the Court ruled at trial that the Hagens opened the door to evidence about the Brightsar and Visionary arrangement and permitted the Government to cross-examine Leah Hagen regarding the arrangement. Tr. Vol. 7, 4–13, 68–81. During cross-examination, Leah Hagen confirmed that "for about ten days" she bought similar "[m]arketing and BPO" services from another entity called Brightsar ("the Brightsar Evidence"). *Id.* at 68. She then confirmed that the contracts she had with Brightsar were "a little different but similar" to the contracts she had with Kimble. *Id.* at 70.

The Hagens argue that admitting the Brightsar Evidence was erroneous, as it had "no probative value." Doc. 289, Defs.' Mot., 19. They further argue that, at the very least, the Court should have engaged in an "on-the-record balancing of probative value versus unfairly prejudicial effect[.]" *Id.* But the Court did not err here.

First, the Court properly admitted the Brightsar Evidence because Leah Hagen opened the door to it. Federal Rule of Evidence 404(b) precludes introduction of evidence of a person's general criminal disposition, but it permits introduction of evidence of "other crimes, wrongs, or acts" which tend to prove a person's "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). Criminal defendants can open the door to evidence of their other wrongs or acts by testifying that they lacked criminal intent or made a mistake. *See United States v. Canga-Renteria*, 1993 WL 117861, at *3 (5th Cir. Mar. 26, 1993) (per curiam) (table decision) ("When Canga-Renteria claimed that he was mistaken as to the purpose

of the trip to Louisiana, he opened the door to evidence which rebutted his defense of mistake. Consequently, the district court properly allowed the prosecution to introduce the 1986 conviction under Fed.R.Evid. 404(b)'s absence-of-mistake provision."); *United States v. Maldonado*, 472 F.3d 388, 398 (5th Cir. 2006) ("A defendant may not complain on appeal that he was prejudiced by evidence relating to a subject which he opened up at trial." (cleaned up and citation omitted)), *abrogated on other grounds by Kentucky v. King*, 563 U.S. 452 (2011).

Leah Hagen opened the door to the Brightstar evidence here. As the Court explained on the record at trial:

> I read through . . . [t]he Twersky stuff last night and the details of it, and I think it's admissible now that she's testified. She spent the whole time talking about lack of intent and this and that, so I think it's admissible.
> . . .
>
> I don't know that it was admissible before she testified. But since she testified and it was all about intent, . . . then I think it goes to intent, it goes to motive, it goes to opportunity, plan, I really do, and I know – I don't know about the Government needing it, but I think that – that she testified to that and . . . I'm going to let them do it.

Tr. Vol. 7, 4, 8. Indeed, Leah Hagen began her testimony by telling the jury that she believes she was arrested in this matter "[b]ecause a con man duped" her. Tr. Vol. 6, 68. She then reiterated that she "[a]bsolutely [did] not" "enter into an agreement to purchase doctors' orders from Mr. Kimble or his companies[.]" *Id.* at 69. She further testified that, after speaking extensively with Kimble regarding his operation and independently researching Kimble herself, she "ha[d] the impression that his companies were legitimate operations." *Id.* at 135–36. By this direct testimony, and further confirmation on cross-examination, that she did not intend to violate the Anti-Kickback Statute, Leah Hagen opened the door to the Brightstar Evidence to refute her claim of lack of intent.

-16-

Nor was the Brightstar Evidence unduly prejudicial. Extrinsic evidence that goes to the defendant's intent is not inadmissible as long as its probative value is not "substantially outweighed by its inherent prejudice." *See United States v. Beechum*, 582 F.2d 898, 910 (5th Cir. 1978) (en banc). Here, Leah Hagen's testimony of her lack of intent increased the probative value of the Brightstar Evidence, causing the Court to shift its prior ruling. And this probative value was not substantially outweighed by any prejudice. Indeed, any prejudice to the Hagens arising from the Brightstar Evidence was mitigated by the fact that the Government simply elicited it from Leah Hagen on cross-examination, rather than by calling Twersky as it initially sought to do. The Brightstar Evidence comprised a few minutes of testimony and a handful of exhibits. The inherent prejudice of this evidence did not substantially outweigh its probative value.[5]

G.   *The Court Did Not Make Improper Comments or Omissions During Trial.*

The Hagens next argue that the Court made "[i]mproper comments" (and omissions) during the course of trial that together "had the effect of endorsing the Government's case and undermining the Hagens' defense, thus improperly influencing the jury. Doc. 289, Defs.' Mot., 19. The Hagens raise seven of these alleged improprieties on the part of the Court. As a preliminary matter, the Court notes that the jury was instructed orally by the Court, and formally in the jury charge, that they must "not assume from anything [the Court] may have said during the trial that [the Court has] any

---

[5] The Hagens mention in passing that in admitting the Brightstar Evidence, the Court did not engage in an on-the-record balancing of its probative value versus its prejudicial effect. Doc. 289, Defs.' Mot., 19. But the Court spoke at length about the probative value of the evidence in light of Leah Hagen's testimony, and it pinpointed the Rule 404(b) elements that the evidence would support. Tr. Vol. 7, 4, 8. Though the Court did not explicitly mention on the record the potential prejudicial effect of the evidence, the Court has thoroughly engaged in the balancing test here, concluding that the probative value is *not* substantially outweighed by any unfair prejudice. Thus, the Court declines to grant the Hagens a new trial on this basis. *See United States v. Anderson*, 933 F.2d 1261, 1269–70 (5th Cir. 1991) (holding that an "on the record" *Beechum* evaluation is only required "[w]hen requested by a party" or when there "is a close question").

opinion about any of the issues in the case. Except for the instructions to [the jury] on the law, [the jury] should disregard anything [the Court] may have said or done during the trial in arriving at [its] own verdict." Tr. Vol. 8, 161; Doc. 281, Jury Instructions, 4. Nonetheless, the Court will address each of the alleged improprieties in turn. None of them singly, or in combination, warrant a new trial.

First, in Kimble's cross-examination, "during a line of questioning by defense counsel that was essential to exposing the fact that the [doctors'] orders were not guaranteed and that they fluctuated weekly," the Court asked Kimble, "But your doctor orders were . . . guaranteed, right?" Doc. 289, Defs.' Mot., at 19–20 n.6 (emphasis omitted) (quoting Tr. Vol. 4, 74). The Hagens cite this as contributing to their need for a new trial. It does not; it was not error. The Court has discretion to "clarify facts presented to the jury[.]" *United States v. Bourgeois*, 950 F.2d 980, 985 (5th Cir. 1992). This discretion extends to asking witnesses questions. *United States v. Duncan*, 919 F.2d 981, 989 (5th Cir. 1990). The Court did not step outside its discretion here.

Second, the Court "made comments . . . on the efficacy of the cross-examination" of Kimble. Doc. 289, Defs.' Mot., 20 n.6 (citing Tr. Vol. 4, 228–30). The Court assumes the Hagens are referring to the Court's comment to the Hagens' counsel that "it seems like you're just . . . thinking of things off the top of your head now. But I can't tell." Tr. Vol. 4, 228. This is not an error. *United States v. Iredia*, 866 F.2d 114, 119 (5th Cir. 1989) (per curiam) (finding no abuse of discretion where trial judge, among other things "rebuked or admonished defense counsel in the presence of the jury, or expressed dissatisfaction with counsel's insistence on following the rules of evidence").

Third, while reading the jury charge aloud on the record, the Court omitted the "Burden of Proof, Reasonable Doubt" heading and read aloud only the substantive content of that instruction. Doc. 289, Defs.' Mot., 20 n.7. The Hagens note this as contributing to their need for a new trial.

Putting aside the fact that each juror had a physical copy of the jury instructions and could follow along while the Court read them aloud—and those jury instructions included all instruction titles—the notion that the inadvertent omission of the title of a jury instruction would warrant an entirely new trial is wholly frivolous. *See generally* Doc. 281, Jury Instruction.

Fourth, while reading the instruction on "Impeachment by Prior Inconsistencies," the Court noted for the jury, "This is like the emails[.]" Doc. 289, Defs.' Mot., 20 n.7 (citing Tr. Vol. 8, 166). The Court's discretion extends to "comment[ing] on [and clarifying] the evidence[.]" *Duncan*, 919 F.2d at 989. The Hagens offer no explanation as to how this stray comment prejudiced the jury. The Court finds no error here.

Fifth, while explaining to the jury that it would be able to review the Superseding Indictment in deliberations, the Court stated:

> I am also sending you back the superseding indictment. I will remind you that the indictment is just a piece of paper. It is no evidence whatsoever of guilt. But you need it because you have to see the charges the Government charged and, in particular to page 9, I think it is, are the overt acts that they have to prove, and they are all there. So you can look at it for reference, but that is it.

Tr. Vol. 8, 195. By taking issue with the Court's comment that "they are all there," *see* Doc. 289, Defs.' Mot., 20 n.7, the Hagens lodge another frivolous complaint against the Court's exercise of its sound discretion in instructing the jury. The Hagens do not explain why the "they are all there" comment is error, let alone how it could have impressed the jury in a manner prejudicial to the Hagens. *See id.* To the contrary, the Court's comment instructed the jury in a manner *helpful* to the Hagens by informing the jury that the Government was required to prove the overt acts that it charged, and where the jury may find "all" those acts.

-19-

Sixth, the Hagens cite one comment from the transcript in which the Court states, "I hope you won't have to send me any notes," arguing that the "jury was discouraged from sending notes[.]" *Id.* (citing Tr. Vol. 8, 196). Even assuming this comment in isolation could be construed as "discourag[ing] . . . notes," the Hagens fail to read the relevant portion of the Court's instructions regarding notes as a whole:

> If you want to talk to me – if you have a question about something, it's really, really important that you have a dispute as to that question. If I get a bunch of notes about, 'What does this mean in the indictment?" Or, "What is that?" I won't answer them. We'll just say that the evidence that you have, the instructions that you have are all you're going to get. I mean, you-all have everything you need to decide this case now.

> I know you don't feel confident, but you will feel confident once you go back there and talk. But if you do send out a note, make sure that it's on something substantive that you are in disagreement about.

> For example, say, We're in disagreement about this portion of Mr. Kimble's testimony, or this portion of Mr. Shores', or this portion of Mr. Hagen's or something like that, we want to know what he said. Don't ask me for the whole transcript. Don't ask me – you know, just be very, very sparing with your notes, because it will take us a while to get back to you; we will get back to you.

> And I hope you won't have to send me any notes, but I have to warn you-all about notes because it's very important. I will want one note from you, which is who your foreperson is and how you will spend your time. So you set your schedule.

Tr. Vol. 8, 195–96. In sum, the Court did not discourage the jury from sending notes. To the contrary, it thoroughly explained how and when the jury may send notes. No reasonable juror would have understood from the Court's narrative that the jury should *not* send notes.

Finally, after reading the formal charge to the jury, the Court stated: "When you reach your verdict – I hope it's soon. But if you reach a verdict, stick it – sign it, stick it in here, and then seal the envelope." *Id.* at 195. The Hagens cite this comment as contributing to their need for a new trial.

Doc. 289, Defs.' Mot., 20 n.7.  It does not. The Hagens offer no reason this stray comment prejudiced the jury. This was not error.

Nor do these comments or omissions taken together warrant a new trial. As the Court has explained above, none of these alleged improprieties were error. The Hagens offer no support for their contention that, taken together, the alleged improprieties gave the jury the impression that the Court favored the Government.

H.      *No "Other Improprieties" Warrant a New Trial.*

Next, the Hagens raise a laundry list of "improprieties" by the Government that they argue deprived them of a fair trial. Those improprieties are:

> (1) inaccurate statements made during a hearing held on June 24, 2020, that Rule 16 discovery had been completed, when in fact it had not; (2) withholding *Brady* material; (3) failing to produce the Shores Report prior to trial as required by Rule 16, *Brady*, and *Giglio*; (4) declining to provide information regarding the production of the Shores Report; (5) injecting the issue of Shores' alleged PTSD symptoms without having notified the Hagens of any such issues prior to his testimony; (6) seeking to suppress and exclude exculpatory  exhibits and testimony pertaining to Mr. Kimble's consultation with his attorneys (as to whom he had waived privilege); (7) portrayals to the jury of patient recordings in a way that gave the impression that the patients were provided braces without the need to consult with a doctor, when in fact the recordings make clear that the patients were repeatedly told they could not receive a brace without consulting with a doctor (who would, in turn, decide whether a prescription for a brace was appropriate); (8) inaccurate portrayals of the nature of emails during the cross-examination of Leah Hagen; (9) using inadmissible, selective, and altered images of the Chronos portal as evidence; and (10) questioning the reliability of the Government's own witness interview reports, especially ones containing exculpatory information.

*Id.* at 21–22 (citations and footnotes omitted).

The Court need not, and will not, delve into these. Aside from two sentences and a few Supreme Court citations regarding prosecutorial misconduct, this list is the entirety of the "other improprieties" section of the Hagens' brief. *See id.* As the Fifth Circuit has made clear, the Court

"does not have the authority to grant a motion for a new trial under Rule 33 on a basis not raised by the defendant," *Shoemaker*, 746 F.3d at 631–32, or raised insufficiently by only "passing reference[.]" *Nguyen*, 507 F.3d at 839–40.

In any event, some of these alleged improprieties relate to the Hagens' fully briefed claimed errors. To that extent, the Court has dealt above with those alleged errors above and incorporates those holdings here. Finally, to the extent the Court has addressed any of these alleged improprieties by order earlier in the litigation of this matter, those findings remain sound and undisturbed. No new trial is warranted due to prosecutorial improprieties.

I.      *No Issues With the Court's Jury Instructions Warrant a New Trial.*

Next, the Hagens argue that a new trial is warranted because "[j]ury instructions were admitted over the Hagens' objections, and other instructions requested by the Hagens were improperly denied." Doc. 289, Mot., 22. Mainly, the Hagens dispute the Court's instruction on deliberate ignorance, stating that it was improper because "the Government's case was based on an alleged agreement to defraud that was knowingly entered[,] . . . and the Government did not elicit any testimony supporting[] deliberate ignorance." *Id.* They further urge that they were denied a "requested balancing instruction that should have accompanied the deliberate ignorance instruction." *Id.* However, contrary to the Hagens' assertions, a deliberate ignorance instruction was properly given, and no balancing instruction was warranted.

 "The term deliberate ignorance denotes a conscious effort to avoid positive knowledge of a fact which is an element of an offense charged, the defendant choosing to remain ignorant so he can plead lack of positive knowledge in the event he should be caught." *United States v. Lara-Velasquez*, 919 F.2d 946, 951 (5th Cir. 1990) (quotations and citation omitted). "The key aspect of deliberate

ignorance" is a conscious attempt to avoid confirming illegal conditions or events that one strongly suspects exist. *Id.* "The purpose of the deliberate ignorance instruction is to inform the jury that it may consider evidence of the defendant's charade of ignorance as circumstantial proof of guilty knowledge." *Id.*

But the instruction is not appropriate in all criminal cases. "The proper role of the deliberate ignorance instruction is not as a backup or supplement in a case that hinges on a defendant's actual knowledge." *United States v. Kuhrt*, 788 F.3d 403, 417 (5th Cir. 2015). The Fifth Circuit has articulated that the instruction is appropriate only when the evidence raises two inferences: "(1) the defendant was subjectively aware of a high probability of the existence of the illegal conduct; and (2) the defendant purposely contrived to avoid learning of the illegal conduct." *Id.* (citing *United States v. Brooks*, 681 F.3d 678, 701 (5th Cir. 2012)).

Here, a deliberate indifference instruction was appropriate. As the Government points out, "there is no dispute that both Leah Hagen and Michael Hagen claimed a lack of guilty knowledge; their central defense at trial . . . is that they were 'conned' by Mr. Kimble." Doc. 291, Gov't's Resp., 22 (citing Tr. Vol. 6, 68–70). Moreover, there was sufficient evidence that the Hagens had a subjective awareness of "a high probability" that their conduct was illegal. *See Kuhrt*, 788 F.3d at 417.

First, the evidence demonstrated that the Hagens were on notice from Medicare that their claims were suspect. Second, the Hagens' own testimonies suggested that they buried their heads in the sand to avoid positive knowledge of the illegality of Kimble's operation. For example, Michael Hagen conceded that he never received any raw leads from Kimble. Tr. Vol. 7, 320 ("I had no interest in seeing [the raw leads]. I had them kept at Pantheon and then handed over to Chronos at the BPO."). He then confirmed that he never received any documents showing "the hours worked

for BPO" because they "[w]ould have not made sense" to him. *Id.* Micahel Hagen also confirmed on cross-examination that they never had their contracts with Kimble reviewed by their own attorneys. Tr. Vol. 7, 156–57. The Court deemed this evidence sufficient to establish subjective awareness of a high probability of illegal conduct and purposeful contrivance to avoid positive knowledge of such. This finding remains unchanged. *United States v. Nguyen*, 493 F.3d 613, 622 (5th Cir. 2007) (approving of deliberate ignorance instruction in money laundering conspiracy case, distinguishing between a "repeated failure to inquire," which can suggest purposeful contrivance, and "a single suspicious incident"); *United States v. Demmit*, 706 F.3d 665, 676 (5th Cir. 2013) (affirming use of instruction in money laundering case where defendant defrauded customers of their insurance annuity business and evidence showed defendant deposited large sums of cash into her bank accounts, made numerous purchases totaling thousands per month even though business commissions clearly could not support such spending, and customers notified her that money had not been deposited into their annuity accounts).

The Hagens' suggestion that a deliberate ignorance instruction is inappropriate in a case such as this where the Government has charged a person with doing something "knowingly," Doc. 289, Defs.' Mot., 22–23, is unfounded. "Deliberate ignorance is the equivalent of knowledge." *United States v. Menendez*, 315 F. App'x 103, 109 (11th Cir. 2008) (per curiam) (citing *United States v. Peddle*, 821 F.2d 1521, 1524 (11th Cir. 1987)). The Fifth Circuit has found no error in instructing the jury on deliberate ignorance in "specific intent" cases. *Nguyen*, 493 F.3d at 624–25 ("Since the jury found the Nguyens deliberately ignorant, and thus, subjectively aware of the high probability of illegalities around them, evidence of their continued facilitation of those highly suspicious transactions may constitute 'specific intent' to further an illegal purpose for which they were

deliberately ignorant."). Indeed, "[t]o the extent that the deliberate ignorance instruction is merely a way of allowing the jury to arrive at the conclusion that the defendant knew the unlawful purpose of the conspiracy, it is hardly inconsistent with a finding that the defendant intended to further the unlawful purpose." *Id.* (cleaned up and citations omitted).

The Hagens' suggestion that the deliberate ignorance instruction should have been accompanied by a balancing instruction is similarly unfounded. In the charge conference, the Hagens proposed the following balancing instruction: "The deliberate ignorance instruction does not lessen the Government's burden to show beyond a reasonable doubt that the knowledge or elements of the alleged crimes have been satisfied." Tr. Vol. 8, 43. However, the Hagens conceded in this hearing that their proposed balancing instruction was not in the Fifth Circuit Pattern Jury Instructions. *Id.* And they provided no further support for this proposed balancing instruction either at the charge conference or in their briefing on the pending motion.[6]

The Hagens lodge two additional complaints about the Court's jury charge that similarly do not warrant a new trial. First, the Hagens state that "[o]ther instructions that were not supported by the evidence were also given, including on aiding and abetting." Doc. 289, Defs.' Mot., 22 (citations to the transcript omitted). Second, they claim "[i]t was also error to deny the Hagens' requested jury instructions, including the instructions on law enforcement testimony and the personal services safe harbor under the Anti-Kickback Statute." *Id.* (citations to the transcript

---

[6] At the charge conference, the Hagens cited *United States v. Vasquez*, 677 F.3d 685, 695–96 (5th Cir. 2021), as supporting their balancing instruction. Tr. Vol. 8, 43–44. *Vasquez* simply notes in passing that "[i]f a deliberate ignorance instruction is given, a 'balancing' instruction should be considered upon the request of defendant." *Vasquez*, 677 F.3d at 695–96. The Court considered the balancing instruction. It declined to give one. The Court thus complied with *Vasquez*.

omitted). The Hagens offer no support for their contention that the evidence did not warrant an aiding and abetting instruction, and they offer no support for their contention that the omission of the safe harbor and law-enforcement testimony instructions were errors. Thus, the Hagens have not sufficiently raised these grounds for relief. *See Nguyen*, 507 F.3d at 839.

Finally, the Hagens claim that "allowing the jury to review the indictment was improper and prejudicial[.]" Doc. 289, Defs.' Mot., 23. This is unfounded because "[t]he trial court has discretion to permit the jury to have a copy of the indictment during its deliberations." *United States v. Haynes*, 573 F.2d 236, 241–42 (5th Cir. 1978) (citations omitted). And the Hagens acknowledge that the Court instructed the jury that the indictment is not evidence.

In sum, no new trial is warranted due to the alleged problems with the Court's instructions to the jury.[7]

J.      *The Verdict Is Not Against the Weight of the Evidence.*

Finally, the Hagens contend the verdict is against the weight of the evidence. Doc. 289, Defs.' Mot., 23. The Court rejects this argument.

First, the Hagens contend their convictions under 18 U.S.C. § 371 are unsupported because the Government failed to prove the Hagens' intent, and because the Government failed to prove "payment per order[.]" *Id.* at 24. Regarding intent, the Hagens emphasize: (1) the Hagens' own "extensive[]" testimonies that they lacked intent; and (2) a portion of Kimble's cross-examination in which he confirmed that he told law-enforcement during an interview that "the Hagens believed

---

[7] The Hagens argue that "[e]ven if no single error individually requires a new trial, the cumulative effect of the errors deprived the Hagens of a fair trial." Doc. 289, Defs.' Mot., 23. Because there was no error, there can be no "cumulative effect" warranting a new trial.

the system was correct," or "[l]egal." *Id.* (quoting Tr. Vol. 4, 236). But the Hagens ignore all the evidence supporting the opposite conclusion, including Kimble's testimony on direct examination that the Hagens knew their contracts with Kimble were disguises. Tr. Vol. 3, 120–23, 166; *see also, e.g.*, Gov't's Exs. 1241, 1147, 1148, 1149 (emails between Kimble and the Hagens discussing how the Hagens would be invoiced); Tr. Vol. 1, 62–63 (employee of the Hagens testifying that the Hagens paid for doctors' orders); Tr. Vol. 2, 273 (Shores testifying that the Hagens knew how Kimble's operation worked). Indeed, as noted above, the competing theories at trial were (1) that the Hagens knew Kimble's operation was illegal and knowingly entered sham contracts to conceal their conduct, and (2) that the Hagens, conned by Kimble, in fact lacked knowledge that his operation was illegal. The jury's verdict is not against the weight of the evidence. It simply reflects that they credited the Government's theory—and the evidence to support it—over the Hagens' theory and their testimonies.

The Hagens' "payment per order" argument is similarly without merit. First, as the Government points out, it is a crime to pay for doctors' orders, whether or not the quantity of those orders is set in advance. *See* 18 U.S.C. § 371. Second, the evidence at trial demonstrated that the Hagens requested a specific number of doctors' orders each week. *See* Gov't's Exs. 902, 1219, 1237, 1240, 1242. The evidence further established that the Hagens would obtain replacement orders from Kimble when they received defective ones. *E.g.*, Tr. Vol. 3, 248.

Second, the Hagens contend their convictions under 18 U.S.C. § 1956(a)(2)(A) are unsupported because the Government failed to prove the Hagens sent money overseas with the intent to promote an unlawful activity. This contention is part and parcel of the Hagens' argument that the Government failed to prove intent sufficient to support the conspiracy-to-defraud

conviction. Because the evidence *was* sufficient to support the Hagens' convictions for conspiracy to defraud, this argument is rejected summarily.

The verdict is not against the weight of the evidence, and no new trial is warranted on this ground.

## IV.

## CONCLUSION

For the foregoing reasons, the Hagens' Joint Rule 33 Motion for New Trial (Doc. 289) is **DENIED.**

SO ORDERED.

SIGNED: August 26, 2021.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE